IN THE FIFTEENTH JUDICIAL DISTRICT COURT
SITTING IN AND FOR WAGONER COUNTY
STATE OF OKLAHOMA

WAGONER COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 0 3 2018

JAMES E. HIGHT
COURT CLERK

WILLIAM FRANKLIN LAFFOON, )
)
Petitioner, )
)
-vs- ) Case No. CF-2010-153
)
THE STATE OF OKLAHOMA, )
)
Respondent. )

## APPLICATION FOR POST-CONVICTION RELIEF
## CERTIFICATE OF MAILING

I, William Franklin Laffoon, hereby certify that I placed the original of the: *Application for Post-Conviction Relief*; *Affidavit in Forma Pauperis*; and *Application for Evidentiary Hearing* in the United States mail, postage prepaid, this 26th Day of June, 2018, addressed to:

Jim Hight, Clerk of Court
Wagoner County Courthouse
307 E. Cherokee St., P.O. Box 249
Wagoner, OK 74467

with instructions to deliver a copy of same to: Brian J. Kuester, District Attorney Office of the District Attorney, located in the Courthouse there, and to the chambers of the Honorable Darrell G. Sheppard, District Court Judge, located in the Courthouse there. I make such statement under the penalty of perjury.

/s/ William Laffoon
William Franklin Laffoon, *pro se*
ODOC-256288-JCCC-Unit 2
216 N. Murray St.
Helena OK 73741-1017

**EXHIBIT 9**

IN THE FIFTEENTH JUDICIAL DISTRICT COURT
SITTING IN AND FOR WAGONER COUNTY
STATE OF OKLAHOMA

WAGONER COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED

JUL 0 3 2018

JAMES E. HIGHT
COURT CLERK

WILLIAM FRANKLIN LAFFOON,        )
                                 )
            Petitioner,          )
                                 )
-vs-                             )      Case No. CF-2010-153
                                 )
THE STATE OF OKLAHOMA,           )
                                 )
            Respondent.          )

## APPLICATION FOR POST-CONVICTION RELIEF
## AFFIDAVIT IN FORMA PAUPERIS

STATE OF OKLAHOMA    )
                     ) ss.    **VERIFICATION**
COUNTY OF ALFALFA    )

**BEFORE ME**, the undersigned Authority, appeared William Franklin Laffoon, who, upon his oath, did depose and state the following:

"I, William Franklin Laffoon, being of lawful age and having been duly sworn, hereby declare that I am a pauper, and that I have no funds to pay for the cost of filing this action or any other costs associated with these proceedings. I further declare that I have no friends or family who can assist me in paying fees associated with this action. I make such statement under the penalty of perjury."

**FURTHER**, the Affiant sayeth not.

/s/ William Laffoon
William Franklin Laffoon, *Affiant*

SUBSCRIBED AND SWORN TO before me this 26th Day of June, 2018.

KRISTEN ROSS
SEAL  Notary Public
State of Oklahoma
Commission # 18001512  Expires 02/13/22

Notary Commission No: 18001512

/s/ [signature]
Notary Public in and For Alfalfa County Oklahoma
My Commission expires: 2/13/2022

IN THE DISTRICT COURT OF WAGONER COUNTY
STATE OF OKLAHOMA

WILLIAM FRANKLIN LAFFOON, )
)
Petitioner, )
)
-vs- ) Case No. CF-2010-153
)
THE STATE OF OKLAHOMA, )
)
Respondent. )

*WAGONER COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED
JUL 03 2018
JAMES E. HIGHT
COURT CLERK*

## APPLICATION FOR POST-CONVICTION RELIEF
## APPLICATION FOR EVIDENTIARY HEARING

**COMES NOW**, William Franklin Laffoon, appearing *pro se* and in forma pauperis, pursuant to **22 O.S. § 1080**, *et. seq.*, to move this Honorable Court to conduct evidentiary hearing in the matter of the *Application for Post-Conviction Relief* filed in the above styled and numbered cause. Petitioner seeks an evidentiary hearing pursuant to **22 O.S. 1084** and *Logan v State*, 2013 OK CR 2, 293 P.3d 969, holding that "if there is an actual dispute about a material issue of fact in the case, the district court is required to conduct evidentiary hearing on the post-conviction application.". *Id.*, **293 P.3d at 978**

**WHEREFORE**, premises considered and for good cause shown, Petitioner moves this Court to Order that evidentiary hearing be conducted pursuant to **22 O.S. 1084**; that Petitioner be brought from his place of confinement to attend such proceedings; and such other relief as this Court deems necessary and just.

**IT IS SO PRAYED.**

Respectfully submitted,

/s/ William Laffoon
William Franklin Laffoon, *pro se*
ODOC-256288-JCCC-Unit 2
216 N. Murray St.
Helena OK 73741-1017

Form 13.11 Application for Post Conviction Relief

WAGONER COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**In the District Court of Wagoner County
State of Oklahoma**

JUL 03 2018

JAMES E. HIGHT
COURT CLERK

| | |
|---|---|
| William Franklin Laffoon, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| -vs- ) | Case No.  CF-2010-153 |
| ) | Cnts 1, 2, 3, and 4 |
| The State of Oklahoma, ) | |
| ) | |
| Respondent. ) | |

## APPLICATION FOR POST-CONVICTION RELIEF

(Petitioner must use one application for each conviction)

### PART A

I, William Franklin Laffoon, whose present address is the Oklahoma Department of Corrections, James Crabtree Correctional Center, 216 N. Murray St., Helena OK 73741-1017, hereby apply for relief under the Post-Conviction Procedure Act, Section 1080 et seq. of Title 22.

The sentence from which I seek relief is as follows:

1. (a) Court in which sentence was rendered: <u>District Court of Wagoner County Oklahoma</u>
   (b) Case Number: <u>CF-2010-153. Counts 1, 2, 3 & 4</u>

2. Date of Sentence: <u>May 27, 2011</u>

3. Terms of Sentence: <u>Count 1: Life in the custody of the Oklahoma Department of Corrections; Count 2: Fifty (50) years incarceration in the custody of the Oklahoma Department of Corrections; Count 3: Seventy-Five (75) years incarceration in the custody of the Oklahoma Department of Corrections; and Count 4: Life Without Parole incarceration in the custody of the Oklahoma Department of Corrections; all sentences to be served consecutively each with the other.</u>

4. Name of Presiding Judge: <u>The Honorable Darrell G. Sheppard, District Court Judge</u>

5. Are you now in custody serving this sentence?   Yes XX   No
   Where? <u>Oklahoma Department of Corrections, James Crabtree Correctional Center, 216 N. Murray St., Helena OK 73741-1017</u>

1

6.  For what crime or crimes were you convicted:
    Count 1: Domestic Assault and Battery, in violation of 21 O.S. § 644 (C)
    Count 2: Assault and Battery with a Dangerous Weapon, in violation of 21 O.S. § 645
    Count 3: Kidnapping, in violation of 21 O.S. § 741
    Count 4: Rape First Degree, in violation of 21 O.S. § 1111 (B)

7.  Check whether finding of guilty was made:
    After plea of guilty ( )      After plea of not guilty (XX)

8.  If found guilty after plea of not guilty, check whether finding was made by:
    A jury (X)        A judge without a jury ()

9.  Name of lawyer who represented you in trial court:
    Jay K. Ramey, Attorney, 1408 S. Denver Avenue, Wagoner OK, 74119-3423 918.582.5444

10. Was your lawyer hired by you or your family?          Yes ()       No (XX)
    Appointed by the Court?                               Yes (XX)     No ()

12. Did a lawyer represent you for appeal?                Yes (XX)     No ()
    Was it the same lawyer as in No. 9 above?             Yes ()       No (XX)
    If "no", what was your lawyer's name? Ricki J. Walterscheid, Attorney at Law
    Address? c/o OIDS, P.O. Box 906, Norman OK 73070 405.801-2727

13. Was an opinion written by the appellate court?        Yes (XX) No ()
    If yes, give citations if published: *Laffoon v State*
    If not published, give appellate case no: F-2011-453, unpublished opinion

14. Did you seek any further review of or relief from your conviction at any other time in any court?                                               Yes (XX)     No ()
    If "Yes", state when you did so, the nature of the claim and the result (include citations to any reported opinions): see: Docket Sheet for **CF-2010-153** on filed with the clerk of Court of Wagoner County Oklahoma

## PART B

(If you have more than one proposition for relief, attach a separate sheet for each proposition. Answer the questions below as to each additional proposition, labeled SECOND PROPOSITION, THIRD PROPOSITION.)

I believe that have <u>One</u> (number of) propositions for relief from the conviction and sentence described in PART A. This is the first proposition:

2

## PROPOSITION
THE STATE OF OKLAHOMA LACKED JURISDICTION TO PROSECUTE PETITIONER BECAUSE THE *Major Crimes Act*, 18 U.S.C.A. § 1153, GIVES THE FEDERAL GOVERNMENT EXCLUSIVE JURISDICTION TO PROSECUTE CRIMES AGAINST PERSONS COMMITTED BY INDIANS IN 'INDIAN COUNTRY'.

(a.) **Jurisdiction**

The Oklahoma *Post-Conviction Procedures Act* 22 O.S. 1971, § 1080 (b) provides the statutory remedy as to addressing the merits of Petitioner's claims alleging a subject matter jurisdiction issue.

(b.) **Standard of Review**

Under prevailing Oklahoma law, issues of subject matter jurisdiction are never waived and can therefore be brought in a collateral review proceeding. *Wallace v State*, 935 P.2d 366, 372 (Okla. Crim. App. 1997); *see also Triplet v Franklin*, 365 Fed. Appx. 86, 95 (10th Cir. 2010) (unpublished) (recognizing that, in Oklahoma, issues of subject matter jurisdiction are not waivable and can be raised for the first time in collateral proceedings); *Wackerly v State*, 237 P.3d 795, 797 (Okla. Crim. App. 2010) (considering jurisdictional claim that crime occurred on federal land raised in petitioner's second application for post-conviction relief); *Magnan v State*, 207 P.3d 397, 402 (Okla. Crim. App. 2009) (considering 'Indian country' jurisdictional challenge and explaining subject matter jurisdiction may be challenged at any time); and, *State v Vallencia*, 241 Ariz. 206, 386 P.3d 392, *cert denied*, 386 S.Ct. 467 (11/27/2017) (a defendant is entitled to post-conviction relief when "[t]here has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence . . . ").

(c.) **Facts relating to this issue**

On April 22, 2010, Petitioner was charged in Wagoner County Oklahoma **Information No. CF-2010-153**, and was arraigned in the District Court of Wagoner County, State of Oklahoma, for the offenses of:
   Count 1: Domestic Assault and Battery, in violation of 21 **O.S.** § 644 (C);
   Count 2: Assault and Battery with a Dangerous Weapon, in violation of 21 **O.S.** § 645;
   Count 3: Kidnapping, in violation of 21 **O.S.** § 741; and,
   Count 4: Rape First Degree, in violation of 21 **O.S.** § 1111 (B).

On May 27, 2011, after Petitioner was found guilty by a Jury, trial Court imposed the following sentences: Count 1: Life incarceration in the custody of the Oklahoma Department of Corrections; Count 2: Fifty (50) years incarceration in the custody of the Oklahoma Department of Corrections; Count 3: Seventy-Five (75) years incarceration in the custody of the Oklahoma Department of Corrections; and Count 4: Life Without Parole incarceration in the custody of the Oklahoma Department of Corrections; all sentences to be served consecutively each with the other.

3

The crimes for which Petitioner was charged, and convicted, under the Wagoner County Felony Information are offenses covered under the *Act*. Therefore, the provisions of the *Act* apply.

The offenses occurred at 21113 East 32nd Street, Broken Arrow, OK, 74014, City of Broken Arrow, County of Wagoner and State of Oklahoma, which is a piece of land partially bought and paid for by the Housing Authority of the Creek Indian Nation which is located in the 'Indian country'. Such location is uniquely distinguished as being within the boundaries recognized by the Congress of the United States of America as the Creek Indian Nation. As such, the location can be seen to be in 'Indian country', as defined under **18 U.S.C.A. § 1151**.[2]

Having determined under the facts of the case that Petitioner is an Indian, who committed an offense enumerated under the *Act*, and that such offense as committed by Petitioner occurred while he was in 'Indian country', it is evident that the State of Oklahoma had no jurisdiction to prosecute the crime and any such conviction resulting from such State prosecution must be seen as *void ab initio*. Since the *Act* applies to Petitioner in this cause, he "shall be tried in the same courts and in the same manner as are all persons committing such offense within the exclusive jurisdiction of the United States". *see*: **18 U.S.C.A. § 3242**

While the argument and documentary evidence attached to this instrument presents as clear and compelling evidence supporting these conclusions, Petitioner recognizes the needs of the State of Oklahoma to verify such assertions before conceding these facts. Accordingly, Petitioner moves this Court to Order this cause be remanded to the District Court for Evidentiary Hearing pursuant to **22 O.S. 1971, § 1084**, to establish for the record that: Petitioner is 1) an Indian, and that 2) the crime occurred in 'Indian country'. Federal statutory language contained within the *Act* irrefutably establishes that the crime is one of the enumerated offenses listed therein. An *Application for Evidentiary Hearing* has been filed simultaneously with this instant *Application*.

(e.)   Analysis

The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history. *Rice v Olsen*, **324 U.S. 786, 789 (1945)** As such, the Supreme Court has established that federal jurisdiction over crimes covered in the *Indian Major Crimes Act* is exclusive of state jurisdiction, *Negonsett v Samuels*, **507 U.S. 99, 103 (1993)**, because the *Act*

---

[2]   'Indian country' is defined as:

(a) all lands within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation,
(b) all dependent Indian communities within the borders of the Untied States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and,
(c) all Indian allotments, the Indian titles of which have not been extinguished, including rights-of-way running through same.

18 U.S.C. § 1151

5

extends to offenses committed by an Indian against the person or property of another person, occurring while in the 'Indian country'.

The Congress of the United States has defined 'Indian country'[3] broadly to include three categories of areas: (a) Indian reservations, (b) dependent Indian communities, and (c) Indian allotments. Congress has defined 'Indian country's' meaning under **18 U.S.C.A. § 1151 (a) (b) and (c)**. If an area qualifies under any definition listed in subsections (a) (b) or (c) of Section 1151 of Title 18, it is 'Indian country'. *see* ***Okla. Tax Comm'n. v Sac and Fox Nation*, 508 U.S. 114, 123 (1993)** (Congress has defined 'Indian country' broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States.) *see also:* ***Indian Country, U.S.A. v Oklahoma ex. rel. Okla. Tax Comm'n*, 829 F.3d 967 (10th Cir. 1987)** *cert. denied* **487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988)** (A formal designation of Indian lands as a reservation is not required for them to have 'Indian country' status) *Id.* **829 F.3d at 973**

The Supreme Court has determined that Congress's definition of 'Indian country' in **18 U.S.C.A. § 1151 (a)** "squarely puts to rest" this argument. *see:* ***Seymour v Superintendent of Washington State Penitentiary*, 368 U.S. 351, 357 (1962)** Therefore, all lands within the boundaries of a reservation has 'Indian country' status.

Only Congress has the power to diminish a reservation. ***Nebraska v Parker*, ____ U.S. ____, ____, 136 S.Ct. 1072, 1082 (2016)**[4] As such, Courts do not lightly infer that Congress has exercised its power to disestablish or diminish a reservation. *see* ***DeCouteau v Dist. Cty. Court for the Tenth Judicial Dist.*, 420 U.S. 425, 444 (1975)** (holding that "[The Supreme] Court does not lightly conclude that an Indian reservation has been terminated") Congress can so act to disestablish or diminish any reservation, but its intent "must be 'clear and plain'." ***South Dakota v Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998)** (quoting ***United States v Dion*, 476 U.S. 734, 738-39 (1986)**. *see also,* ***Solem v Bartlett*, 466 U.S. 463 (1984)** (explaining Congress must "clearly evince an intent to change boundaries before diminishment will be found" (quotations omitted). *Id.* **465 U.S. at 496**.[5]

---

[3]   As the Oklahoma Supreme Court clarified:

> "The touchstone for allocating authority among the various governments has been the concept of 'Indian Country', a legal term delineating the territorial boundaries of federal, state and tribal jurisdiction. Historically, the conduct of Indians and interest in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has been obtained."

*Ahboah v. Housing Auth. of the Kiowa Tribe*, **660 P.2d 625, 627 (Okla. 1983)**; see *May v Seneca-Cayuga*, **711 P.2d at 79-82 & n. 26** (recognizing relevance of Indian country classification in eastern Oklahoma, formerly Indian Territory.)

[4]   See also: ***United States v Jackson*, 853 F.3d 436 (CA 8 4/4/2017)** *cert denied,* **138 S.Ct. 935 (February 20, 2018)** (reaffirming the decision in *Nebraska v Parker* that "only congress can diminish a reservation border") *Id.,* **853 F.3d at 439**

[5]   As the Supreme Court reaffirmed two Terms ago, *Solem v. Bartlett* provides the "well settled" framework for assessing disestablishment. *Nebraska v. Parker,* **136 S.Ct. 1072, 1078-79 (2016)**. "[O]nly Congress can divest a reservation of its land," and its intent must be "clear[]." *Solem v. Bartlett,* **465 U.S. 463, 470 (1984)**. In analyzing

6

### (e.) (1.)   Establishment of the current boundaries of the Creek Indian Nation

While making solemn promises and guarantees to Indian people,[6] the United States adopted a policy aimed at completely extinguishing the Indian Nations rights to their native lands. *Choctaw Nation v Oklahoma*, 397 U.S. 620, 623 (1970) Since the establishment of the United States, the federal government and the Creek Nation have entered into numerous treaties related to the forced relocation of the Indian people. As early as the 1820's, the federal government adopted a policy to remove the Five Civilized Tribes[7] from the southeastern United States, and relocate them west of the Mississippi River, in what is today Oklahoma. *Indian Country, U.S.A.*, 829 F.2d at 971

These treaties were imposed on the Indians and they had no choice but to consent. As a consequence, the Supreme Court has often held that that treaties with the Indians must be interpreted as they would have understood them, *Choctaw Nation*, 397 U.S. at 631 (citing *Jones v Meehan*, 175 U.S. 1, 11 (1899)) and any doubtful expressions in them should be resolved in the Indians favor. *Id.* (citing *Alaska Pacific Fisheries v United States*, 248 U.S. 78, 89 (1902))[8]

---

boundary's, the Court starts with "statutory language" (the "most probative" indication of congressional intent), then turns to "circumstances surrounding the" statutes (less probative), and "subsequent history" (least probative). *Parker*, 136 U.S. at 1079, 1081 (quotation marks omitted)

[6]   As the Honorable Mr. Justice Douglas noted:

> "We should therefore resolve any doubts in these cases in favor of these Indians, mindful of what President [Andrew] Jackson said at a meeting with the Choctaw and Chickasaws:
>
> 'Brothers, listen: the only plan by which this can be done and tranquility for your people obtained, is, that you pass across the Mississippi to a country in all respects equal, if not superior, to the one you have. Your great father will give it to you for ever, that it may belong to you and your children while you shall exist as a nation free from all interruption.
> Peace invites you there; annoyance will be left behind; within your limits, no State or territorial authority will be permitted; intruders, traders, and above all, ardent spirits, so destructive to health and morals, will be kept from you, only as the laws and ordinances of your nation may sanction their admission.' S. Doc No. 512, 23d Cong., 1st Sess. Vol. 2, 240-242."

*Choctaw Nation*, 397 U.S. at 643-44, Douglas, J, concurring

[7]   "The Cherokees, Chickasaws, Choctaws, Creeks and Seminoles historically have been referred to as the 'Five Civilized Tribes'" *Indian Country, U.S.A.*, 829 F.2d at 970, n. 2

[8]   The United States promised the Five Tribes that as long as they occupied their lands, they would never be subject to the laws of any State or Territory, and their land would never be made part of any State or Territory. *Treaty with the Creek Tribe of Indians* art. XIV, Mar. 24, 1832, 7 Stat. 366, 368.1 ( see also: *Convention with the Cherokees* pmbl., May 6, 1828, 7 Stat. 312; *Convention with the Chickasaws* art. II, May 24, 1834, 7 Stat. 450; *Convention between the Choctaws and Chickasaws* art. I, Jan. 17, 1837, 7 Stat. 605; *Treaty with the Choctaws* art. IV, Sept. 27, 1830, 7 Stat. 333; *Treaty with the Creeks and Seminoles* arts. I, IV, Aug. 7, 1856, 11 Stat. 699, 700.)

The Genesis of such negotiations can be found in the *Treaty with the Creeks*, Jan. 24, 1826, 7 Stat. 286. see 1826 WL 2688. Relevant to this collateral proceeding, this Court is moved to direct its attention to the *Treaty with the Creeks*, June 14, 1866, 14 Stat. 785, *see* 1886 WL 18777. Such *Treaty*, with its establishment of the boundaries of the Creek Reservation in 1866, is recognized by the Creek Indian Nation to still be the boundaries of the Creek Reservation tribal land today. Relying on specific language that "the Creek Nation retained title to its 'reduced . . . reservation'" which the United States promised would be "'forever set apart as a home for said Creek Nation'", *see Treaty with the Creeks*, 1866, at art.'s 3, 9, 14 Stat. at 786, 788, the boundaries remain intact. In such documents, the people of the Creek Nation were promised that "no part of the land granted to them shall ever be embraced in any Territory or State". [9]

The ratification of the *1866 Treaty* by Congress is notable in the language establishing courts in the Indian Territory [now known as the State of Oklahoma] "with such jurisdiction and organized in such manner as Congress may by law provide". *1866 Treaty,* art. 10, 14 Stat. at 789. This Treaty also guaranteed that Congress would not "interfere with or annul . . . present tribal organization, rights, laws, privileges, [or] customs." *Id.*

The 1867 ratification of the Constitution of the Creek Indian Nation established its government under the *1866 Treaty*. Such document included "a separation of powers into executive, legislative and judicial branches", *Muscogee (Creek) Nation v Hodel*, 851 F.2d 1439, 1441 (D.C.Cir. 1988), and firmly established the Creeks as a distinct and functioning 'nation' operating within the boundaries set by Congress in the *1866 Treaty.*

Despite subsequent attempts by the federal government to engage the Creek Nation in dialogue which would diminish those boundaries, or those of any of the Five Civilized Tribes, such attempts proved to be fruitless. The Creek Indian Nation has never engaged in formal negotiations with Congress beyond the *1866 Treaty*, and Congress did not exercise its power to disestablish or diminish such boundaries. see: *Lonewolf v Hitchcock*, holding that "Congress has the power to unilaterally abrogate treaties made with Indian Tribes", 187 U.S. 553 (1903) Congress' plenary power to modify or eliminate tribal rights, *Yankton Sioux Tribe*, 522 U.S. at 34, includes the power to eliminate or reduce a reservation against a tribes wishes and without its consent. *see Solem*, 465 U.S. at 470

Congress has never dissolved the Creek government.[10] The Creeks have enjoyed continuous and uninterrupted existence, up to and including modern times.[11] The recognition is

---

[9]  *See also*: *Treaty with the Cherokees of May 6, 1828*, 7 Stat. 311, spoke of the desire of the United States to provide the Cherokees 'a permanent home, and which shall, under the most solemn guarantee of the United States, be, and remain, theirs forever – a home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a Territory or State, nor be pressed upon by the extension, in any way, of any limits of any existing Territory or State'. *Treaty of May 6, 1828*, 7 Stat. 311. *see Choctaw Nation*, 397 U.S. at 636, Douglas, J, concurring

[10]  The "Five Tribes Act," ch. 1876, 34 Stat. 137, April 26, 1906, provided that the Creek Nation's "tribal existence and present tribal government[]" would "continue[] in full force and effect for all purposes authorized by law, until otherwise provided by law." § 28, 34 Stat. at 148. Such act provided for distribution of wealth upon dissolution of the Nation under § 15, 34 Stat. at 143. Later in 1906, however, Congress delayed implementation of § 15 – providing for the sale of tribal property – and clarified it would "not take effect until the date of the

8

that the Creek nation has retained power to "fix the terms upon which non citizens might conduct business within its territorial boundaries" and has not "lost the power to govern the people within its borders." ***Buster v Wright*, 135 F. 947, 951-52 (8th Cir. 1903)** *appeal dismissed* **203 U.S. 599, 27 S.Ct. 777, 51 L.Ed 334 (1906)**[12]

The reservation boundaries set by Congress in as to the Creek Nation boundaries qualifies as an area defined under **18 U.S.C. § 1151 (a)**.[13] As such, and based on an understanding of **OKLA. CONST. Art. 1, § 3**, federal jurisdiction is exclusive to "all lands lying within said limits owned or held by any Indian tribe". *Id*.[14] *see also: Solem*, **465 U.S. at 475;** *and see, Mashunkashey v Mashunkashey***, 191 Okla. 501, 1134 P.2d 976 (Okla. 1942)**

None of the acts of Congress ever diminished the reservation[15] boundaries of the Creek Indian Nation, including those areas where the event disputed occurred, *i.e.*, 21113 East 32nd

---

dissolution of the tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes", **Act of June 21, 1906, ch. 3504, 35 Stat. 325, 342.** The "Five Tribes Act" thus recognized that the Creek Nation's government continued to exist in full force and effect and, notably, it did not terminate the Creek Reservation's borders. Such action further reinforced the promise "no part of the land granted to them shall ever be embraced in any Territory or State". *Choctaw Nation*, **397 U.S. at 635**

[11]     Under the *Indian Self-Determination and Education Assistance Act of 1975*, **PL 93-638**, the Creek Nation retained the sovereign right to operate as independent an Nation. Under such Act, the Creek Nation retained the freedom to negotiate with the federal government so that the tribe could hold elections, take over administration of the health services, contract BIA programs, begin businesses and, most importantly for purposes of this collateral proceeding, retain reservation tribal boundaries for establishment of the Creek Nation.

[12]     As Lyndon Baines Johnson, President of the United States of America, noted:

> "We must affirm the right of the first Americans to remain Indians while exercising their rights as Americans. We must affirm their right to freedom of choice and self-determination. We must seek new ways to provide federal assistance to Indians-with the new emphasis on Indian self-help and with respect for Indian culture. And we must assure the Indian people that it is our desire and intention that the special relationship between the Indian and his government grow and flourish. For, the first among us must not be the last."

LBJ, Message to Congress "*The Forgotten American*," March 6, 1968.

[13]     Courts, too, recognized that the reservation endured. After the Oklahoma Enabling Act, **Act of June 16, 1906, ch. 3334, Pub. L. No. 59-233, 34 Stat. 267,** *U.S. Express Co. v. Friedman*, **191 F. 673 (8th Cir. 1911),** rejected the argument that the "Indian Territory ceased to be 'Indian country' upon the admission of Oklahoma as a state," observing that the Five Tribes "owned about 3,000,000 acres or more of land," and "[i]t would indeed be difficult to show how this land ceased to be Indian country." *Id.* **at 678-79.**

[14]     In 1906, Congress enacted the Oklahoma Enabling Act, **Act of June 16, 1906, ch. 3334, Pub. L. No. 59-233, 34 Stat. 267** ("Enabling Act"). While paving the way for statehood, Congress mandated that nothing in the new constitution "limit or impair the rights of person or property pertaining to the Indians of said Territories," or "limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights." **Enabling Act § 1.** The Act thus preserved "the control of the United States of the large Indian reservations ...of the new state." *Coyle v. Smith*, **221 U.S. 559, 570 (1911).**

[15]     The term Indian reservation and Indian allotment has been used in various ways to define 'Indian country'. *Indian Country, U.S.A. v Oklahoma ex. rel. Okla. Tax Comm'n*, **829 F.3d 967, 973 (10th Cir. 1987)** *cert. denied* **487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988),** citing *Cohen's Handbook of Federal Indian Law* at 34-

9

Street, Broken Arrow, OK, 74014, Wagoner County, State of Oklahoma, and, as such, retains its 'Indian country' status. (See: Exhibit I, Letter from Creek Nation of Oklahoma Housing authority). No matter how strong the argument made by the State, the boundaries remain intact today,[16] and nothing said can work to alter this fact. As the Supreme Court recently so eloquently stated "we cannot remake history". *Nebraska v Parker*, ___ U.S. ___, ___, 136 S.Ct. 1072, 1082 (2016)[17]

The Creek Nation and its territorial boundaries remain intact today. Thus, the location within such territorial boundaries where Petitioner (an Indian) committed the offense convicted of can be seen to have occurred in 'Indian country'. Accordingly, jurisdiction to prosecute the offenses charged in Wagoner County Oklahoma Felony Information CF-2010-153 rests exclusively with the Federal Government.

**(f.)   Establishment of the location of the offense as 'Indian country' under 18 U.S.C. 1151 (b) and (c)**

As argued, the offenses were alleged to have occurred at 21113 East 32nd Street, Broken Arrow, OK, 74014, City of Broken Arrow, County of Wagoner and State of Oklahoma. Not only is this location geographically within the boundaries of the Creek Indian Reservation as discussed, but the land and home is further distinguished because this location was purchased and paid for by moneys awarded to Petitioner's family by the Housing Authority of the Creek Indian Nation on June 12, 2001. (See Exhibit A)

This home remains in the sole custody of the Laffoon family of the Creek Indian Nation, was purchased by and thru the Creek Indian nation and qualifies as 'Indian country' under **18 U.S.C. 1151 (b) and (c)**. The home constitutes the "purest form of 'Indian country'", *see: Indian Country, U.S.A. v Oklahoma ex. rel. Okla. Tax Comm'n*, 829 F.3d 967 (10th Cir. 1987) and falls squarely within the jurisdiction of the Muscogee (Creek) Indian Court.[18]

---

38 (R. Strickland ed. 1982) Gradually, the term has come to describe "federally-protected Indian tribal lands", *Id*,. at 35 n. 66, meaning those lands which Congress has set aside for tribal and federal jurisdiction. *cf. Solem v Bartlett*, 465 U.S. 463, 468-69 (1984)

[16]   Congress characterized those lands for the Creek Indian tribe as an "Indian reservation" and has never diminished those boundaries using express language of "cession" since that date. *see South Dakota v Yankton Sioux Tribe*, 522 U.S. 329 (1894 Act); *Solem*, 465 U.S. at 464 (1984) (1908 Act); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 585 (1977) (1904, 1907, and 1910 acts); *DeCoteau v. Dist. Cty. Ct. for Tenth Judicial Dist.*, 420 U.S. 425, 441-42 (1975) (1891 Act); *Mattz v Arnett*, 412 U.S. 481 at 484-85 (1973) (1892 Act); *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 354 (1962) (1906 Act).

[17]   As such, Courts do not lightly infer that Congress has exercised its power to disestablish or diminish a reservation. *see DeCouteau*, 420 U.S.at 444 (holding that "[The Supreme] Court does not lightly conclude that an Indian reservation has been terminated") Congress can so act to disestablish or diminish any reservation, but its intent "must be 'clear and plain'." *Yankton Sioux Tribe*, 522 U.S. at 343 (quoting *Dion*, 476 U.S. at 738-39)

[18]   *See*: **Muscogee (Creek) Indian Nation Court Rules and Procedures, Tit. 27 § 1-102 Jurisdiction:**

"(A) (1) The Muscogee (Creek) Nation Indian Country Territorial Jurisdiction consists as: (1) Property owned by any Muscogee Citizen subject to federal jurisdiction against alienation or held in trust by the United States for the benefit of any Muscogee Citizen; or, (2) Property held in trust by the United States for the benefit of the Muscogee (Creek)

10

(g.)   **Conclusion**

It is undisputed that any Indian who commits a crime as enumerated under the *Indian Major Crimes Act* as proscribed at **18 U.S.C. § 1153 (a)** while on any land within Indian country is subject to prosecution for such offense exclusively by a Federal Court. *see United States v Celestine*, 215 U.S. 278, 284-87 (1909)[19]; *United States v Thomas*, 151 U.S. 577, 585-86 (1894). When such facts are demonstrated establishing that 1) an Indian 2) while in Indian country 3) commits any criminal offense covered under the *Major Crimes Act*, such person is immune from State criminal prosecution for such criminal act.

The State of Oklahoma has the right to seek exclusive criminal and civil jurisdiction of events that occur within its geographical jurisdiction, but never has. One important law enacted in 1953, "Public Law 83-280" addressed state jurisdiction. It allowed some states "to assert limited civil and broad criminal jurisdiction in Indian country" *Indian Country, U.S.A.*, 829 F.2d at 980 (citing **ch. 505, 67 Stat. 588 (Aug 15, 1953)**) without tribal consent. A 1968 amendment to Public Law 83-280 made subsequent assumptions of jurisdiction subject to Indian consent. *see*: **25 U.S.C. §§ 1321(a), 1322(a), 1326**, referred to as the *Indian Civil Rights Act*.[20]

However, the State of Oklahoma never acted pursuant to Public Law 83-280, or obtained tribal consent following the 1968 amended *Indian Civil Rights Act* and has thus never acquired jurisdiction over the Indian country. *see Cravatt v State*, 825 P.2d 277, 279 (Okla. Crim. App. 1992) (holding that "[Q]uite simply the State of Oklahoma does not have jurisdiction over crimes committed by or against an Indian in 'Indian country'" [because] "the State of Oklahoma has never acted pursuant to Public Law 83-280." (quoting *State v Klindt*, 782 P.2d 401, 403 (Okla. Crim. App. 1989)).

---

Nation; or, (3) any property owned by Muscogee (Creek) Nation; or, (4) Property which is otherwise constitutes Indian country as that term is used in 18 U.S.C. § 1151."

[19]   The Court explained in *Celestine* that reservation status depends on the boundaries Congress draws, not on who owns the land inside the reservation's boundaries: "When Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." *Celestine*, 215 U.S. at 285 This understanding of reservations has continued. *Solem*, 465 U.S. at 470

[20]   In 1990, the Attorney General for the State of Oklahoma noted:

> "Prior to the *Indian Civil Rights Act* of 1968, the State could have assumed jurisdiction over all Indian country merely by legislative act. In 1953, it was suggested by the Department of Interior that Oklahoma consider assuming such jurisdiction over Indian Lands under **Public Law 280**. Oklahoma declined to do so, and since the passage of the *Indian Civil Rights Act*, permission of the tribes is now a necessary prerequisite to the State assuming jurisdiction. *United States v Burnett*, 777 F.2d 593 (10th cir. 1985) *cert. denied*, 476 U.S. 1106, 106 S.Ct. 1952, 90 L.Ed. 2d 361 (1986)."

*Oklahoma Attorney Generals Opinion* No. 90-32, at 1, 22 Okl. Op. Atty. Gen 71 (Okla. A.G.), 1991 WL 576868

11

Having established Petitioner's standing as an Indian,[21] and that the offenses charged were listed as a crime covered under the *Indian Major Crimes Act*, and that the offenses occurred in 'Indian country' this Court is moved to weigh such argument as applied to the facts of this case. The fact is that the State's decision to prosecute this case, and trial Court's decision to deny post-conviction relief when the issue was raised in the *Application for Post-Conviction Relief* now under review, in light of prevailing Supreme Court case law, was so lacking in justification that this, in and of itself, constitutes error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement such that no fair-minded jurist can now conclude otherwise. *see: Woods v Etherton*, ___ U.S. ___, ___, 136 S.Ct. 1149, 1151 (2016) citing *White v Woodall*, ___ U.S. ___, ___, 134 S.Ct. 1697, 1702 (2014); *see also, Harrington v Richter*, 582 U.S. 86, 101, 102, 131 S.Ct. 770 (2011)

As such, this Court must direct the sentence imposed in Wagoner County CF-2010-153, be Vacated, dismiss the Information with prejudice to re-filing, and release the Petitioner from such unlawful confinement without delay. Should the Federal Government choose to prosecute such offense is a decision that must be left to agents of the Federal Government.

1. Of what legal right or privilege do you believe you were deprived in your case?

Trial Court lacked jurisdiction to prosecute Petitioner under the felony information charged (see: above.)

2. In the facts of your case, what happened to deprive you of that legal right or privilege and who made the error of which you complain?

See: argument, *supra*.

3. List by name any case or cases that are very close factually and legally to yours as examples of the error you believe occurred in your case?

*Choctaw Nation v Oklahoma*, 397 U.S. 620, 635 (1970); *Solem v Bartlett*, 465 U.S. 463 (1984); *Wallace v State*, 935 P.2d 366, 372 (Okla. Crim. App. 1997); *see also Triplet v Franklin*, 365 Fed. Appx. 86, 95 (10th Cir. 2010) (unpublished); *Wackerly v State*, 237 P.3d 795, 797 (Okla. Crim. App. 2010) (considering jurisdictional claim that crime occurred on federal land raised in petitioner's second application for post-conviction relief); *Magnan v State*, 207 P.3d 397, 402 (Okla. Crim. App. 2009); and, *see: State v Vallencia*, 241 Ariz. 206, 386 P.3d 392, *cert denied*, 386 S.Ct. 467 (11/27/2017), 2017 WL 2424075 (11/27/2017) (a defendant is entitled to post-conviction relief when "[t]here has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence . . . ".

---

[21] To establish status as an Indian, two elements should be satisfied: (1) that the person has a degree of percentage of Indian blood; and (2) that the person is recognized by some tribe as an Indian. *Goforth v State*, 644 P.2d 114, 116 (Okla. Crim. App. 1982) (Petitioner has satisfied this requirement with the BIA Certificate of Degree of Indian Blood attached to this trial Court Application.)

4.  How do you think you could now prove the facts you have stated in Question No. 2, above? Attach supporting documentation.

   Exhibit 1
   Evidentiary Hearing. *Application for Evidentiary Hearing* has been filed simultaneously with this instant *Application.*

5.  If you did not timely appeal the original conviction, set forth facts showing how you were denied a direct appeal through no fault of your own. Not Applicable. Petitioner did appeal (see: page 2, *supra)*

6.  Is this a proposition that could have been raised on direct appeal?   Yes (XX)   No ()

   **Note**: Trial Court lacked jurisdiction to hear the cause and prosecute the offense. The prosecution of the offense by the State of Oklahoma was *void ab initio*. The resulting conviction has violated Petitioner federally protected rights under the Due Process and Equal Protection Clauses. **U.S. Const. Amend. XIV**

## PART C

I understand that I have an absolute right to appeal to the Court of Criminal Appeals from the trial court's order entered in this case, but unless I do so within (30) days after the entry of the trial judge's order, I will have waived my right to appeal as provided by Section 1087 of Title 22.

## PART D

I have read the foregoing application and assignment(s) of error and hereby state under oath that there are no other grounds upon which I wish to attack the judgment and sentence under which I am presently convicted. I realize that I cannot later raise or assert any reason or ground known to me at this time or which could have been discovered by me by the exercise of reasonableness diligence. I further realize that I am not entitled to file a second or subsequent application for post-conviction relief based upon facts within my knowledge or which I could discover with reasonable diligence.

## PART E (As Applicable)

I hereby apply to have counsel appointed to represent me. I believe I am entitled to relief. I do not possess any money or property except the following: (if none, state "None").

13

None  (Pauper's Affidavit filed simultaneously with this *Application*)

6-26-18
Date

/s/ William Laffoon
William Franklin Laffoon, *pro se*
ODOC-256288-JCCC-Unit 4
216 N. Murray St.
Helena OK 73741-1017

STATE OF OKLAHOMA  )
                  ) ss   **VERIFICATION**
COUNTY OF ALFALFA  )

William Franklin Laffoon, being first sworn under oath, states that he signed the above application and the statements therein are true and correct to the best of his knowledge and belief.

/s/ William Laffoon
William Franklin Laffoon, *Affiant*
ODOC-256288-JCCC-Unit 2
216 N. Murray St.
Helena OK 73741-1017

Subscribed and sworn to before me this ___ Day of June 20 18.

/s/ Kristen Ross
Notary Public

KRISTEN ROSS
Notary Public
State of Oklahoma
Commission # 18001512  Expires 02/13/22

/s/ 2/13/2022
My Commission expires

14

Exhibit 1



**HOUSING AUTHORITY** of the Creek Nation of Oklahoma

James Walters
Executive Director

Ann Hancock
Deputy Director

P.O. Box 297 · Okmulgee, OK 74447 · 918/756-8504 · 1-800-259-5050 · Fax 918/756-9548

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
OKMULGEE OFFICE

CERTIFICATE OF DEGREE OF INDIAN BLOOD
This is to certify that William Franklin Laffoon
born 12-6-77 is 1/128 degree Indian blood of the Creek Tribe.
NOV 29 1992
Date        Issuing Officer

June 12, 2001

Frankie and Juanita Laffoon
PO Box 580583
Tulsa, OK 74158

RE: AWARD LETTER

Dear Mr. and Mrs. Laffoon:

This letter is to serve as notification that you have been approved for grant assistance from the Mortgage Assistance Program (MAP). You have been approved for $21,076 grant assistance based on a maximum purchase price of $71,500. The grant is contingent upon the following:

- Lender approval is required;
- Property **may be** required to be within the Muscogee (Creek) Nation jurisdictional boundaries;
- Property must be built after January 1, 1978;
- Property must meet lead base paint requirements;
- Property must meet environmental review requirements;
- Continued eligibility with the Mortgage Assistance Program until the date of loan closing; and
- Loan must close.

Please contact Stephanie Howell as soon as possible so that we may schedule a loan origination appointment with you. Your file will be transferred to Frances Root, Loan Supervisor, for further processing after completion of loan origination. Please contact Ms. Root with any questions at the number listed below.

If you are in disagreement with the decision, you are entitled to an informal hearing by the Grant Review Committee if a request for such a hearing is made within a reasonable time. If you have any questions please contact us at (918) 759-4126.

Sincerely,

Frances Root

Frances Root, Loan/Counseling Supervisor
Mortgage Assistance Program

FR:sh

114 N. Grand, Okmulgee, OK 74447